[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The plaintiff wife, 44, brought this action by complaint dated August 27, 1993, with service of the summons and complaint in hand CT Page 7458 made September 2, 1993 on the defendant husband, 48, seeking a dissolution of their marriage and other relief. The parties married on December 21, 1974 in Stamford, Connecticut. The plaintiff's allegation that she had resided continuously in Connecticut for at least the twelve months next preceding the date of the filing of her complaint is found proven, satisfying § 46b-44, Connecticut General Statutes. Only the three children of the marriage have been born to the plaintiff wife: Richard Edward, born 4/5/79, Christopher Thomas, born 6/3/81, and Ingrida Anna, born 9/20/85.
All custody and visitation issues were settled and stipulated by the parties on January 9, 1995 before the court (Steinberg, J.). It is attached hereto as Appendix A, including an addendum dated February 5, 1995. The financial issues were tried before the undersigned judge at trial commencing February 16, 1995. Claims for relief were filed on March 7, 1995 at which time this court took the papers for decision.
The plaintiff's parents immigrated to the United States from Latvia in 1948. The plaintiff's grandfather owned three parcels of real estate in Latvia, and a fourth parcel was owned by her grandfather and his father. After the Soviet Union annexed Latvia, all private ownership was voided, and the plaintiff's family was exiled to Siberia. Since the collapse of the Soviet Union, Latvia has regained its independence, and for the past several years, the Latvian government has been restoring private real estate ownership upon satisfactory proof that all interests outstanding in a parcel are accounted for. This court heard a Latvian attorney, who qualified as an expert witness, testify as to the applicable law and procedures necessary to establish private ownership. The plaintiff's family is currently in process involving a cousin, a second cousin, her b, and herself. Plaintiff's Exhibit # 13 stated that the parcel located in the city of Jurmala is not registered. Plaintiff's Exhibit # 14 stated that the parcel known as "LANTES" has not been registered. Plaintiff's Exhibit # 15 stated that the parcel on Dzirnava Street and the parcel on Cesu Street have not been registered. The court concludes that although private ownership has been applied for and is in process, that the plaintiff does not yet have any private ownership rights to any of the four parcels. The court concludes that is is speculation to assign any value to these interests at this time.
The plaintiff graduated from Ohio University with a B.S. degree. She began working for C.B.S. Labs in 1973 as a secretary. CT Page 7459 The defendant was then employed as an engineer at the same company. After their marriage the plaintiff was forced to leave C.B.S. since a spouse could not be employed where the husband worked.
The parties decided to purchase a home in Darien. They did not have the necessary funds. They jointly decided to ask the defendant's mother for a loan for the down payment which the parties agreed to pay back. The plaintiff admits there is about $6,000 still due her mother-in-law, Sylvia O. Johnson.
This court has also heard the case of Sylvia O. Johnson vs. Richard O. Johnson and Irma A. Johnson, Docket CV93 0135695 S. The defendant's mother brought suit alleging loans due from both plaintiff and defendant totaling $64,000 plus the value of certain carpets. The defendant husband admits all of his mother's allegations. The plaintiff admits only that initial loan and denies the balance of the allegations. A separate memorandum deciding that case is cross referenced for the facts are intertwined and the cases were consolidated for trial.
It is uncontroverted that Sylvia Johnson loaned $15,000 to make possible the purchase of the parties' first home in early 1979.
The defendant was then employed by Exxon where he worked from 1976 to 1981. In that year he was hired by another company as Vice President for Business Development where he continued to work until 1987 when he received a severance package. On November 13, 1987 the defendant launched his own consulting business which generated a steady income. By 1993, the plaintiff's business generated a net profit of $104,459 less $9,940 self employment tax and $8,250 income tax, or $86,270 net disposable income before Connecticut income tax (Joint Exhibit #5). On the first financial affidavit the defendant filed in this case dated December 6, 1993 he stated a 1993 projection of $120,000 net profit for 1993 (Document # 113).
The parties sold their first Darien home in 1987 using the proceeds to buy property known as Shady Acres for $610,000. This property was sold in June, 1994 with the remaining net proceeds of $158,000 still escrowed after $30,000 was released to each party.
The plaintiff became employed by Latvian Renassaince as President in 1991 after volunteering her services for the three prior years. In 1994, the organization also furnished a leased car. The plaintiff made several trips to Latvia, sometimes CT Page 7460 establishing extended stays in that country as well as trips to Washington, D.C.. The defendant volunteered his time, particularly with the non-profit compliance paper work and related administrative matters.
The plaintiff's concentration on Latvian affairs led to an affair with the Latvian ambassador assigned to the United States. By the time of trial, the plaintiff acknowledged she intended to marry the ambassador. The plaintiff found fault with the defendant in many ways, but the court concludes that the plaintiff's affair was the primary cause of the breakdown of the marriage.
There was much evidence concerning the respective spending habits of the parties. The court does not find such evidence critical in assessing the causes of the marriage breakdown. The court also finds as fact that the defendant's mother has been loaning money to the defendant over the past several years as evidenced by the judgments entered in the companion case. The court concludes that the defendant's earnings and earning capacity are not identical and are not accurately reflected on the defendant's financial affidavits dated February 28, 1995 and February 15, 1995. If the defendant has no taxable income than he has no income tax liability. The defendant lost a valued client in 1994 but the court finds that a blanket deduction for "business exp. " self serving and not probative in arriving at his actual net disposable income. The defendant has demonstrated an earning capacity exceeding $80,000 of net disposable income in 1993 and, after allowing for the loss of a substantial customer, the court finds the defendant to have in earning capacity annually of $40,000 net disposable income at the present time, Miller v. Miller,181 Conn. 610.
By the same token, the plaintiff has demonstrated an earning capacity of $927 net disposable monthly income as per her financial affidavit dated February 15, 1995.
Therefore, the combined net disposable income of the parties is found to be $51,124 annually, or $983 weekly, with defendant's share being 78%. The Connecticut Child Support and Arrearage Guidelines call for $297 weekly to be paid to the plaintiff for the support of the three children.
The parties have 50% interest in a home located in New Hampshire. The court finds their equity interest to have a fair market value of $40,000 after deducting the mortgage (defendant's CT Page 7461 Exhibit A). The defendant has an IRA containing $93,000. He had previously withdrawn $25,000, $31,000, and $24,000, netting $10,000, $11,000 and $15,000 after taxes (plaintiff's Exhibit #19)
There are miscellaneous items of tangible personal property in dispute. The court will enter an order regarding them.
The court has reviewed the evidence, evaluated the parties' credibility and has considered the statutory criteria in reaching the following judgment.
 1. A decree is entered dissolving the parties' marriage on the ground of irretrievable breakdown, utilizing the complaint. The cross complaint is dismissed as moot.
 2. The court accepts and incorporates the parties' stipulation entered before the court (Steinberg, J.) as well as the addendum, all referred to supra, as the orders for custody and visitation.
 3. Child support of $297 weekly is ordered paid by defendant directly to the plaintiff for the support of the three children.
 4. The defendant shall continue to maintain the present medical insurance listed on his financial affidavit for the minor children. The provisions of Section 46b-84(d) shall apply to the filing of claims. The parties shall share equally any unreimbursed medical expenses incurred for the benefit of the minor children. A quarterly accounting and settlement shall be had between the parents.
5. No periodic alimony is awarded.
 6. The plaintiff shall retain her interest in the four parcels of real estate located in Latvia.
 7. The defendant is awarded the plaintiff's interest in the lakeside property located in Washington, New Hampshire. The defendant shall prepare the quit claim deed and bear the expense for the transfer which is to be "as is", including any contents previously owned or claimed by the plaintiff. CT Page 7462
 8. The proceeds of the Shady Acres sale shall be disbursed as follows:
 a) to Attorney Mark H. Henderson, who served as counsel for the minor children, $25,500 in full and final settlement of his billing, Court Exhibit # 1, to be deducted before division of the funds;
 b) to Dr. Steven Sichel $2,500 to be deducted before division of the remaining fund;
 c) to Sylvia Johnson, in payment of the judgment entered jointly against these parties $6,000 to be deducted before division of the remaining funds;
 d) to Attorney Daiga G. Osis and Gans and Reynolds, as an allowance to prosecute, $30,000 to be deducted from the defendant's share. The remaining fund should pay $62,716 to the plaintiff and $32,716 to the defendant.
 9. The parties shall be each responsible for one-half of the capital gain resulting from the sale of Shady Acres.
 10. The defendant shall be solely responsible for repayment of the credit line due Union Trust.
 11. The plaintiff is awarded $40,000 as her share of the plaintiff's IRA account, as a non-taxable transfer.
 12. The remainining [remaining] bills as listed on the respective financial affidavits shall be paid by the party so listing it. The Brooks Brothers debt which does not appear on either financial affidavit, shall be paid by the defendant. The mediator's bill, also not listed, shall be paid by the defendant.
 13. The defendant is awarded the oil painting of acrobats signed Dagnija, oil painting of rooster, oil painting by Avens, the Cornell hockey stick, any remaining personal papers, defendant's clothing, and any other items the plaintiff is willing to deliver to the CT Page 7463 defendant. The plaintiff is ordered not to destroy or give or sell any items of personal property from the marital home until the defendant has declined to accept and reduce it to his possession.
 14. All remaining assets not mentioned above shall be retained and owned by the party now in possession of same, including bank accounts, the defendant's business, and its related equipment and jewelry.
 15. Any pendente arrearage shall not merge in this judgment but shall be paid in full.
16. A contingent wage withholding order is entered.
Counsel for the plaintiff is directed to prepare the judgment file.
HARRIGAN, J.
APPENDIX A
D.N.: FA 93-0134056S
IRMA A. JOHNSON : SUPERIOR COURT :
vs. : J.D. OF STAMFORD/NORWALK : AT STAMFORD RICHARD O. JOHNSON : JANUARY 9, 1995
STIPULATED AGREEMENT OF THE PARTIES
The undersigned parties hereby stipulate and agree as follows:
1. The Father and the Mother shall have joint legal custody of the minor children. The Mother shall be the primary residential parent, and she shall have the day-to-day responsibility for the children's care, guidance, well being and upbringing.
2. The Father shall have the right of reasonable, flexible and liberal visitation with the children. During the periods of visitation, the Father shall have the day-to-day responsibility for the children's care, guidance well being and upbringing. CT Page 7464
3. The parties further agree that the Mother shall be entitled to relocate her principal residence from her current residence in Darien, Connecticut to a new residence in the Washington, D.C./Maryland/Virginia area. However, the aforementioned relocation by the Mother shall not take place until the Mother's remarriage or the acceptance by the Mother of a bona fide written offer of employment in the Washington, D.C./Maryland/Virginia area and the acquisition of living quarters in that area, whichever event is first to occur. However, in no event shall the children relocate on or before August 31, 1995 except that if school commences.*
4. Until the aforementioned relocation occurs, the parties expressly agree that the visitation between the Father and the minor children shall include the following:
a) every other weekend from Friday after school until Tuesday morning when the Father drops off the children at school;
b) each Thursday that the Father does have weekend visitation the preceding weekend from after school until 8:00 p. m.;
c) in the weeks during which the Father does not have weekend visitation with the minor children, the Father shall be entitled to have the minor children on Monday and Wednesday nights from after school until 8:00 p. m.;
d) in the event that there is no school on Tuesdays following the Father's overnight, the Father shall deliver the children to the Mother's residence by 1:00 p. m. The Father shall drop off the children's overnight bags with all of their clothes at the Mother's residence immediately before or after dropping off the children at school.
e) the parties further agree that in the event that the children do not have school on any Monday, Wednesday or Friday scheduled for visitation, said visitation shall commence at 10:00 a.m. that morning;
f) the parties further agree that any child's request to visit with the Father at any other time shall be permitted, subject to the children's activities. The Mother agrees that her consent to this additional visitation shall not unreasonably be withheld.
5. Until the relocation occurs, the parties agree to the following additional aspects relative to visitation:
a. At any time that either the Father or the Mother are to have CT Page 7465 the minor children with them, whether during periods of custody or visitation, and either party is unable to exercise that time with the children, the parties agree that the other parent shall be the presumptive caretaker for the children during said period of time. In other words if either the Father or the Mother is unable to utilize their time with the children, the other parent is entitled to that time with the children before such time as any third party shall be utilized for that purpose.
b. The parties further agree that in all circumstances, the children's homework shall be completed before they are returned to the Mother's residence.
c. The parties further agree that the children's return from visitation from the Father's residence to the Mother's residence shall occur on or before 8:00 p. m. on the applicable date, time being of the essence.
d. The parties further agree that the aforementioned visitation schedule shall apply unless there is notice from one parent to the other parent at least forty-eight (48) hours in advance of the scheduled visitation time, except in the event of an emergency.
e. The parties further agree that in the event that visitation is cancelled by either parent the Father shall be entitled to make that visitation time with the minor children at a mutually convenient and reasonable time.
f. The parties agree that the minor children shall engage in counselling and therapy, as needed, with therapists agreed upon by the parents.
6. With regard to the Thanksgiving holiday, the parties agree that the 1994 Thanksgiving holiday and vacation from school shall be spent with the Mother, the 1995 Thanksgiving holiday and vacation from school shall be spent with the Father and the parties agree to alternate this holiday and vacation in all future years.
7. With regard to the 1994 Christmas vacation from school, the parties agree that the children will spend Christmas eve with the Mother and will be delivered to the Father's residence on Christmas Day by 10:00 a.m. and be entitled to spend the balance of the Christmas vacation from school with the Father, provided they are returned to the Mother's residence by 8:00 p. m. the night before school starts.
8. The parties agree that they will alternate the Easter weekend CT Page 7466 each year and the parties further agree to alternate the winter and spring vacations from school each year with the Mother having the winter vacation in 1995 and the Father having the spring vacation in 1995 and alternating those vacations from year to year. In addition, until the relocation occurs, the parties agree to share the children's respective birthdays and the parties further agree that the Mother shall spend Mother's Day and her birthday with the children and that the Father shall spend Father's Day and his birthday with the children.
9. The holiday and vacation weekends shall supersede the regular alternating weekend schedule. However, if the Father has had such a holiday or vacation weekend, the Mother shall have the children the following weekend and the alternating weekend visitation shall recommence thereafter.
10. Upon the Mother's relocation to the Washington, D.C./Maryland/Virginia area, the parties agree to the following general principles relative to visitation:
a. The parties agree that the visitation schedule set forth herein shall apply unless there is notice from one parent to the other parent at least forty-eight (48) hours in advance of the scheduled visitation time except in the event of an emergency.
b. The parties further agree that in the event that visitation is cancelled by either parent, the Father shall be entitled to make up that visitation time with the minor children at a mutually convenient and reasonable time.
c. The Mother agrees that she shall not live with any unrelated male until such time as a formal marriage ceremony takes place.
d. In the event that the Father is in the area where the children will be living on business or otherwise, the parties agree that the Father shall be permitted access to visit with the children during that trip, which such access shall not unreasonably be denied.
e. The parties further expressly agree that they shall alternate and/or equally share financial and transportation responsibilities for the minor children regarding visitation with their father. The parties further agree to maintain maximum flexibility relative to transportation with the children so that, e.g.: the Father will drive the children one way and the Mother will drive the other way for any given visit; the parties may meet at some middle point for both the travel to and from visitation; one party will be responsible for transportation on CT Page 7467 one weekend visit and the other parent shall be responsible for the cost of travel for the other weekend visit in that month; etc. In essence, the parties expressly agree to be equally responsible on both an economic and transportation basis relative to visitation by the minor children with the Father.
11. Once the minor children and the Mother have relocated to the Washington, D.C./Maryland/Virginia area, the Father shall be entitled to the following visitation with the minor children:
a. Alternating weekends, which such weekends shall be agreed upon by the parties on a calendar year basis by the utilization of an actual calendar and the mapping out by the parties by agreement of the applicable weekends. The parties further agree that said weekends shall, whenever possible, be earmarked for those weekends that have a Friday or Monday holiday so as to maximize the time that the minor children spend with the Father. However, the three day weekends are not meant to be in addition to regular alternating weekends but rather to replace one regular visitation weekend.
b. In addition, the alternating major holiday schedule set forth above shall apply upon the relocation by the Mother and minor children, with the exception of the Christmas vacation, which vacation from school shall be equally divided between the parties so that the first half of the vacation in the first Christmas after relocation shall be with the Father and the second half of said vacation shall be the Mother, which such sharing of the Christmas holiday shall alternate in each successive year.
c. In addition, the Father shall be entitled to exercise visitation with the minor children on six out of every eight weeks of summer vacation, with the specific weeks of summer vacation to be exercised by the Father to be agreed upon by the parties on or before May 1 of each calendar year. The parties agree, however, that the Father's six weeks shall be either: three uninterrupted weeks, then one week with the Mother and then three additional uninterrupted weeks with the Father; or six uninterrupted weeks with the Father subject to the Mother being entitled to exercise visitation with the children on two weekends of said six weeks from Friday at 5:00 p. m. until Sunday at 8:00 p. m. In the event that the children have more than eight weeks summer vacation, the parties agree to equally share any weeks in excess of said eight weeks.
d. The parties further agree that the minor children, once relocated to the Washington, D.C./Maryland/Virginia area, shall not relocate farther away from the Father's residence without court order permitting said relocation. Similarly, the Mother agrees to not relocate CT Page 7468 her residence nor that of the minor children to the Republic of Latvia under any circumstances.
e. The parties agree that in the event that the weekend visitation to be exercised by the Father is two days or less each month, then the parties will use their best efforts to see to it that the children travel from their home to Connecticut or to the residence of the Father on only one occasion that month. To the extent that there is at least one three-day weekend during any given month, then the parties agree that the children may travel for both of such weekend visits to the Father's residence.
f. The parties further agree that the children shall be returned by the Father to the Mother's residence at the end of each visitation by 9:00 p. m., but in no event later than 9:30 p. m.
g. The holiday and vacation weekends shall supersede the regular alternating weekend schedule. However, if the Father has had such a holiday or vacation weekend, the Mother shall have the children the following weekend and the alternating weekend visitation shall recommence thereafter.
12. The parties shall have reasonable access to the children while they are with the other party, including free access by mail and free access by telephone during reasonable hours of the day and evening.
13. The parties shall exert every reasonable effort to maintain free access and unhampered contact between the children and each of the parties and the other party. Neither party shall do anything which may estrange the children from the other party or injure the opinion of the children as to the children's mother or father nor act in such a way as to hamper the free and natural development of the children's love and respect for the other party.
14. The parties shall confer and endeavor to agree with each other on all important matters pertaining to the children's health, education, welfare and upbringing, with a view to arriving at a harmonious policy calculated to promote the best interests of the children. Each party shall take into consideration the need of the other party to be informed as to the children's whereabouts.
15. In the event of the illness or personal injury of said children, the first party to learn of such illness or injury shall notify the other immediately and each party shall keep the other informed at all times of the whereabouts of said children. For the purposes of this paragraph, the CT Page 7469 word "illness" shall mean any sickness or ailment which requires the services of a physician. The word "injury" shall mean any injury which requires the services of a physician. During any illness or accident, the Father shall have the rights of reasonable visitation to see the children in addition to the other rights provided herein.
16. Each of the parties will immediately furnish to the other copies of any reports from third parties concerning the health, education or welfare of the children.
17. Any expense or cost involved in the exercise of the Father's rights of visitation except the costs of transportation for the children as set forth herein shall be and remain his sole responsibility and will be paid for by him. Any such costs or expense incurred by the Father in connection with the exercise of his rights of visitation shall be separate and apart and in addition to any and all payments made or to be made to the Mother for the support of said children.
18. It is understood and agreed that this agreement is entered into under the laws of the State of Connecticut and in the construction or execution of the same, the laws of the State of Connecticut shall be deemed to apply and prevail.
Irma A. Johnson, Richard O. Johnson,
THE PLAINTIFF THE DEFENDANT
By By Laiga Osis Richard O. Johnson, Pro Se 1087 Broad Street 11 Pond Lane Bridgeport, CT 06604 P.O. Box 2478 Tel.: 203-366-5773 Darien, CT 06820 Juris #306084 Tel.: 203-656-1400
THE ATTORNEY FOR THE MINOR CHILDREN
By Mark H. Henderson WOFSEY, ROSEN, KWESKIN 
KURIANSKY 600 Summer Street Stamford, CT 06901 Tel.: 203-327-2300 Juris #68550 CT Page 7470